IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 19, 2020

**STATE OF TENNESSEE v. DALLAS SARDEN**

**Appeal from the Criminal Court for Washington County
No. 40924B   Stacy L. Street, Judge**

_____

**No. E2019-01616-CCA-R3-CD**

_____

The Defendant-Appellant, Dallas Sarden, was convicted by a Washington County jury of first-degree felony murder and robbery, for which he received an effective sentence of life imprisonment plus five years.  In this appeal as of right, the Defendant raises the following issues for our review: (1) whether the State committed prosecutorial misconduct and whether the trial court abused its discretion in denying the Defendant's request for a mistrial based on the same; (2) whether the trial court erred in allowing the introduction of pre-recorded testimony of the forensic pathologist and whether the photographs displayed during the testimony unduly prejudiced the Defendant; (3) whether the evidence is sufficient to sustain the Defendant's convictions; and (4) whether the Defendant is entitled to relief under the cumulative error doctrine.  After a thorough review of the relevant facts and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Patrick Denton, Johnson City, Tennessee, for the Defendant-Appellant, Dallas Sarden.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Ken C. Baldwin, District Attorney General; and Fred Lance, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In the late-night hours of August 17, 2015, the Defendant and co-defendant, Aaron Garland,[1] entered the apartment of the victim, Karen Parker, suffocated or strangled her to death, and ransacked her apartment. The victim's body was discovered in her living room the next morning by the apartment's maintenance men. Subsequent investigation revealed that the Defendant and co-defendant Garland used the victim's debit card and a Wal-Mart gift card, which were found on the Defendant's person upon arrest. During an interview, the Defendant also provided incriminating statements to the Johnson City Police Department (JCPD) as to his involvement, and the investigation also established that he confessed to killing the victim to his cell-mate. The following proof was adduced at the Defendant's trial, which took place on April 9-12, 2018.

On August 18, 2015, Randy Miller, the pest control worker at the victim's apartment complex, knocked on the victim's door to complete regularly scheduled maintenance. When the victim did not open the door, the maintenance manager at the apartment complex, Michael Hollifield, used a key to open the victim's door, and they entered the apartment, where they found the victim lying on the floor "partially undressed with either a blanket or a sheet across her face" and no pulse. They called the police, and Miller later identified a photograph at trial showing the crime scene as he observed it that day.

Michael Hollifield, the maintenance manager, also testified that he had been in the victim's apartment several times, and described her as a "sweet, gentle woman." He saw the victim the day before the offense, and she was "in a good mood" and "everything appeared normal." When he discovered the victim's body, she was lying near the couch with "one leg [] up under the couch and the rest of her [] up under her end table." He said "[s]he looked like she had been in a struggle and the furniture and everything else was pretty much tossed." Hollifield also identified a photograph of the crime scene and several additional photographs of the victim's apartment. He said the corner of the victim's couch was lying on top of her, and her apartment was in disarray and "totally different from what the norm would be."

Sergeant Stephen Diehl of the Johnson City Fire Department (JCFD) responded to an "obvious death" call at Clark Manor Apartments on the morning of August 18, 2015. Upon entering the victim's apartment, he found the victim's lifeless body in the position as described by Miller and Hollifield. He exited the victim's apartment, secured the scene, and waited for the JCPD to arrive.

Kristen Osgood, the "legal death" investigator from the William Jenkins Forensic Center, responded to the crime scene to collect information to assist the medical examiner

---

[1] Prior to trial, the Defendant's case was severed from co-defendant Garland's case pursuant to Bruton v. United States, 391 U.S. 123 (1968).

in determining the manner and cause of the victim's death. She also took photographs of the crime scene, admitted at trial, showing the victim lying on her back with her pants pulled down and her underwear partially exposed, her right leg under the corner of the couch, and "some bedding items over her head." There were also photographs of the couch that was on the victim's leg, various personal items, including a purse and a wallet strewn on the couch, the inside of a wallet, a jewelry box, and an entertainment center with its drawers open. Osgood took photographs of the victim's body from multiple angles, the "process of removing the layers" of blankets and pillows from the victim's head until her face was showing, and she noted a "reddish-brown substance" that was on the part of the pillow that was covering the victim's face. She also noted an "area of discoloration" on the victim's upper right chest and a "couple of linear marks on her chest just below her breast." Osgood handled an "FTA card,[2]" which contained a blood sample collected from the victim. On cross-examination, Osgood testified that she observed several bottles of prescription medication in the victim's kitchen.

Vanessa Gause, the victim's neighbor, testified via a pre-recorded video deposition at which the Defendant and defense counsel were present and cross-examined the witness. Gause was allowed to testify by video because she had a pre-scheduled vacation during the week of the Defendant's trial. Gause lived next to the victim for ten years, and they saw each other a couple of times a week for several years. Their apartments shared a wall, and the victim knocked on the wall if she needed Gause's help. A little after ten o'clock on August 17, 2015, the victim knocked on Gause's door to ask for a soda, and they talked for about five minutes in Gause's apartment. The victim was wearing a t-shirt and shorts, and Gause did not notice any abnormal marks on the victim. Gause identified a photograph of the victim as she appeared on that day. Gause also identified photographs of the victim after her death, and Gause said that the victim did not have any marks on her face when Gause last saw her. Gause said that she would have taken the victim to the hospital had she noticed any bruising on her face. Gause said that the victim always kept her house neat. She identified photographs taken at the victim's apartment after her death, and she said "[the victim's] house would never look like this." Gause was at her apartment on the evening of August 17, 2015 until "about 25 til 7" the next morning, but she never heard the victim call for help. Gause did not know the Defendant or co-defendant Garland. On cross-examination, Gause said that the victim had mentioned co-defendant Garland a few days before she died, and the victim appeared to be scared of him. Gause had never seen the Defendant or co-defendant Garland. She believed that co-defendant Garland's family lived in the same apartment complex as the victim.

---

[2] The acronym "FTA" is not specifically defined; however, we glean from the record that it refers to the collection of a DNA sample from an individual.

Officer Steve Sherfey, an investigator for the JCPD who was undergoing cancer treatment at the time of the Defendant's trial, also testified through a pre-recorded video deposition at which the Defendant was present and represented by counsel. Officer Sherfey reported to the crime scene, assisted another investigator in collecting evidence from the crime scene, and identified a series of photographs showing the victim as the items were being removed from her face. Officer Sherfey also identified the blanket and pillow that were covering the victim's face at the crime scene. He said that the pillow was transported to the Tennessee Bureau of Investigation (TBI) for a blood analysis. Officer Sherfey identified three wallets, a "faux alligator" skin wallet, a tan wallet, and a black wallet with a floral design, that were collected from the crime scene, as well as a photograph showing where the wallets were found. Officer Sherfey found all of these wallets lying out on the couch and some of the wallets had items sticking out of them. On cross-examination, Officer Sherfey stated that he could not remember if he specifically collected the wallets from the crime scene, but he did observe them. He did not collect any forensic information from the crime scene.

Dr. E. Hunt Scheuerman, the forensic pathologist who performed the autopsy on the victim on August 19, 2015, was also unavailable to testify at the Defendant's trial, so his testimony was taken prior to trial with the Defendant and defense counsel present, and the video was played for the jury. Dr. Scheuerman identified the FTA card that contained blood samples from the victim. He also identified the pillow that was covering the victim's face at the crime scene, and he pointed out red-brown stains on the pillow. Dr. Scheuerman identified several photographs that he took during the victim's autopsy. The victim had bruising and swelling on her wrists and forearms, which Dr. Scheuerman said was consistent with blunt force trauma. He said that this type of injury could have been caused by someone holding the victim's arms tightly in these areas. Dr. Scheuerman also identified photographs of the victim's face, which showed small abrasions on the left side of her face and discoloration on her lower lip. He agreed that these injuries could be caused by someone holding a pillow over the victim's face, and he stated that these injuries would have bled. He also noted bruising and discoloration on the right side of the victim's face, which he said could be caused by a "blow to the head." The victim also had bruising on the left side of her forehead caused by blunt force trauma. Dr. Scheuerman did not believe that this type of bruising would be caused by a cloth substance such as a pillow. Another photograph showed bruising under the victim's chin caused by blunt force trauma.

Dr. Scheuerman also identified a photograph of the victim's upper torso showing a bruise on the victim's right breast and "linear red-orange abrasions" under her breasts. He stated that the underwire of the victim's bra could have caused these abrasions. He agreed that these injuries could be caused by someone sitting on the victim's chest while she was struggling to get up. Dr. Scheuerman identified a photograph of the victim's right leg showing a patterned compression mark, which he believed matched the foot of the victim's

couch. The victim had bruising caused by blunt force trauma on her right lower leg and an abrasion on her left flank, which he opined could be caused by someone dragging the victim or something hitting her. The last set of photographs identified by Dr. Scheuerman showed an abrasion, a contusion, and a subdural hematoma on the victim's head. He agreed that these injuries were consistent with someone holding the victim's head against the carpet with the pillow while she struggled. He said that it would take "some force" to cause this type of injury and that it would be possible for this type of injury to occur from someone's holding the victim's head against the carpet with a pillow, although he believed this would come from more direct blunt force trauma.

Dr. Scheuerman's autopsy report was entered into evidence. He opined that the victim's cause of death was "suffocation, blunt force injuries, and possible manual strangulation with significant contributing factors being coronary atherosclerosis or the hardening of the . . . arteries that feed the heart muscle itself, hypertensive heart disease, and chronic obstructive pulmonary disease (COPD), which is bronchitis with emphysema." He said that the victim's COPD would make her more susceptible to manual strangulation or asphyxiation. He also said that pressure from someone sitting on the victim's chest would be a contributing factor to her inability to breathe. He opined that the victim could have died by manual strangulation due to the bruising around her neck and bleeding under her skin near her sternum.

On cross-examination, Dr. Scheuerman stated that any or all of the listed causes of death, or a combination, could have led to the victim's death. He said that he could not give a specific window of time as to how long it took for the victim to die, although he said that "compression of the jugular vein" could take up to eight minutes for death to occur, but compression of the carotid artery could lead to death in "seconds." He could not be certain which mechanism occurred based on the victim's autopsy. Dr. Scheuerman agreed that, all other variables being equal, it would "be more likely that someone who is heavier" would break the ribs of a victim than someone who is lighter. He agreed that there was no physical evidence that more than one person was responsible for inflicting the injuries on the victim. On redirect examination, Dr. Scheuerman said that he could not exclude a scenario where two individuals were taking turns sitting on the victim.

TBI Special Agent Charly Castelbuono identified the victim's FTA card and the pillow recovered from the crime scene, which she tested for the presence of blood and DNA. The DNA matched the victim, and a swab from the pillow gave a DNA profile that was "consistent with the mixture of three (3) individuals including at least one (1) male." Agent Castelbuono received buccal swabs from the Defendant and co-defendant and fingernail clippings from the victim, but she was unable to find anything "of note." Her report was entered into evidence.

Laura Chandley, the victim's sister, testified that she bought a Wal-Mart gift card for the victim for her birthday. The State admitted into evidence a screen shot from Wal-Mart security footage showing Chandley exiting the building and a copy of the receipt reflecting the purchase of the gift card on August 14, 2015, two days prior to the offense. The number on the back of the gift card matched the number on the receipt. Chandley testified that she canceled the victim's credit card after her death. Darren Ricker, the asset protection manager at Wal-Mart, also identified the same receipt showing the purchase of a gift card on August 14, 2015, as well as a summary of the purchases made on this card. The summary showed the date the card was activated, a gasoline purchase at 9:51 p.m. on August 18, 2015, a store purchase at 3:59 p.m. on August 19, 2015, and another store purchase at 2:45 a.m. on August 20, 2015. Ricker identified the receipts from the in-store purchases and the gift card used to make these purchases.

Ashley Hickman had known co-defendant Garland since high school, and met the Defendant through co-defendant Garland. On August 18, 2015, co-defendant Garland messaged Hickman through the Defendant's phone asking for a ride. She told them that she could pick them up in a few hours, and she picked them up from Red Lobster in Johnson City around 9:00 p.m. She took them back to her apartment, where they stayed for around an hour. Hickman testified that she did not observe anything abnormal between the two, and neither of them were trying to "dominate" the other. She stated that the Defendant was making phone calls to arrange a ride to Kingsport. Hickman, her fiancé, the Defendant, and co-defendant Garland left in Hickman's car and stopped at the Wal-Mart Murphy's gas station. Hickman stated that she and her fiancé were sitting in the front seats, while the Defendant and co-defendant Garland were in the back. She did not hear them say anything during the ride. When they arrived at the gas station, the Defendant and co-defendant Garland asked Hickman's fiancé to pay for the gas with a card, but he refused. Co-defendant Garland got out of the car and paid for the gas with a card. They left the gas station in Hickman's car and later stopped at the McDonald's drive-thru in Boones Creek. Hickman and her fiancé paid for their order with cash, and the Defendant and co-defendant Garland paid with a card. She did not know which man handed her the card to pay. The State played a video showing Hickman's car going through the McDonald's drive-thru, which she confirmed. After leaving McDonald's, Hickman drove to Kingsport, and she dropped the Defendant and co-defendant Garland off at Burger King. She said she did not notice any suspicious behavior from the men at the time, and she did not see them again. On cross-examination, Hickman said that she spent approximately three hours with the Defendant and co-defendant Garland, and she said nothing seemed out of the ordinary. She did not agree that the Defendant was playing the "deferential position" between he and co-defendant Garland.

Leeona Burgmann, the manager at McDonald's on East Stone Drive in Kingsport in August 2015, located the video showing the McDonald's purchase for the JCPD, which

was played for the jury. The video showed two men, identified as the Defendant and co-defendant Garland, approach the counter at McDonald's, and the Defendant appeared to swipe a card at the register.[3] The Defendant approached the counter again a few minutes later and appeared to swipe a card again. He approached the counter a third time to pick up his food. Ronnie Larkins, Jr., a taxi driver for Cabbie Cab at the time, received a call from Red Roof Inn on August 19, 2015, about driving two people to Greenville. He drove to the Red Roof Inn, where he picked up a Caucasian male and an African American male. He said that the men changed their minds due to the price of the cab fare to Greenville and asked to be taken to the Fort Henry Mall. One of the men handed Larkins a card from the back seat to pay the seven dollar fare to the mall. He believed that this took place in the morning. Larkins was later contacted by the police and advised that the card used to pay the fare was obtained illegally. Larkins voided the transaction and provided the receipt to the officers. This receipt was entered into evidence. Larkins identified the Defendant as the African American male that he drove that night.

Glenda Nester, the head supervisor at Shoney's in Kingsport, testified that the Defendant and a white male came into the restaurant on August 19, 2015, and she seated them. She said that the men were there for an hour and a half to two hours, and they both went outside and came back in several times. She said that the white man came to the register to pay the bill with a credit card, while the African-American man went outside. Nester ran the credit card three times, and it declined each time. She noticed that the first name on the card was "Karen," so she asked the man where "Karen" was, and he said she was at the motel. When the man said he had no other way to pay the bill, she called the police, who arrived shortly thereafter. Nester said that the white man stepped around the corner of the counter when the police officer arrived, while the African-American man never reentered the restaurant. Two women offered to pay the men's bill, so the officer left. Nester identified the ticket given to the men to pay their bill.

Lori Ann Cordell, a server at Shoney's, testified that the Defendant and another man were seated at a table in her section on the morning of August 19, 2015. She stated that the Defendant was asking questions about the menu and seemed to be "more in charge of the conversation" than the other man. After the men ate, she placed the bill on their table, and the Defendant exited the restaurant while the other man tried to pay. When Cordell went outside to take a break, she saw the Defendant, and he began asking her questions about the transaction and told her that his mother was coming from Greenville to pay the bill. He also told her that his cell phone died, and he said that the credit card belonged to his mother and that she had given it to him to use in Kingsport.

---

[3] The video is time stamped 23:34:20 on August 18, 2015. Burgmann testified that the date stamp on the video is correct, but the time stamp is off by an hour.

Officer Mike Campbell responded to Shoney's on August 19, 2015, following a call that someone had not paid their bill. While Officer Campbell was gathering information for his report, the African-American male, later identified as the Defendant, re-entered the restaurant and told him that the credit card that they tried to use was his grandmother's card, that he was trying to contact his grandmother to come to Shoney's to pay the bill, and that his phone had died and he did not have his grandmother's number memorized. Officer Campbell asked the Defendant to charge his phone so he could retrieve the number. While waiting for the Defendant's phone to charge, Officer Campbell asked to see the credit card, and the Defendant explained that the white male, who he called John Lane, had the card. The Defendant also said that he was in Kingsport to visit this man. During this time, the manager at Shoney's told Officer Campbell that someone had paid the men's bill, so he let the Defendant go and left.

John Patterson, the branch manager at Regions Bank in Johnson City, testified that he compiled a history of the activity on the victim's debit card from August 18-19, 2015. We have reproduced the exhibit below:

**[Victim's] Debit Card**
**Timeline of Transactions**

| Date | Military Time | Standard Time | Merchant | Amount | Posted |
|------|---------------|---------------|----------|--------|--------|
| 1. 8/18/2015 | 21:00:21 | 9:00 PM | McDonald's F350 | $4.92 | Yes |
| 2. 8/18/2015 | 22:54:23 | 10:54 PM | Kroger #328 | $5.37 | Yes |
| 3. 8/18/2015 | 23:29:58 | 11:29 PM | Exxon 3408 | $1.52 | Yes |
| 4. 8/18/2015 | 23:36:30 | 11:36 PM | McDonald's F173 | $8.51 | Yes |
| 5. 8/18/2015 | 23:38:01 | 11:38 PM | McDonald's F173 | $2.29 | Yes |

**Victim's Debit Card Closed 8/19/2015[4]**

| Date | Military Time | Standard Time | Merchant | Amount | Posted |
|------|---------------|---------------|----------|--------|--------|
| 6. 8/19/2015 | 1:05:19 | 1:05 AM | GreyHound | $253.00 | No |
| 7. 8/19/2015 | 1:05:19 | 1:05 AM | GreyHound Reversal | $253.00 | No |
| 8. 8/19/2015 | 8:22:39 | 8:22 AM | Cabbie Cab | $7.00 | No |
| 9. 8/19/2015 | 9:15:34 | 9:15 AM | Shoney's #2 | $20.99 | No |
| 10. 8/19/2015 | 9:45:01 | 9:45 AM | Shoney's #2 | $20.99 | No |
| 11. 8/19/2015 | 12:40:40 | 12:40 PM | KFC J718011 | $1.96 | No |

Kingsport Police Department (KPD) Investigator Martin Taylor received information from the JCPD that the victim's credit card was being used. He learned that

---

[4] Patterson testified that the victim's debit card was closed sometime between the last purchase made at McDonald's on 8/18/2015 and the next day.

the individuals who were using the victim's card were on foot so he drove around and located the Defendant and co-defendant Garland walking down the street. Investigator Taylor detained both men, and he told the Defendant that he was being detained due to the incident at Shoney's, upon which the Defendant stated that the card belonged to his mother, Karen Parker. Investigator Taylor searched the Defendant and recovered a receipt from Wal-Mart and a Wal-Mart gift card with "Happy Birthday to You" written on it. He arrested the Defendant on an unrelated matter and transported him to the Kingsport Police Department separately from co-defendant Garland.

Derik Bailey testified that he was the Defendant's cell mate on "several occasions" at the Washington County Detention Center. During this time, the Defendant told Bailey that he trusted him. The Defendant told Bailey that he had received a text message from co-defendant Garland, and he met up with him. Bailey recounted what the Defendant told him:

> So they walked to some apartments and [co-defendant Garland] walked up and knocked on the lady's door and asked her for a cigarette. She said she didn't have one, so [co-defendant Garland] and him proceeded to walk away and then [co-defendant Garland] had went back and knocked again. Then, when she opened the door, that he hit her in the face and that she started stumbling back and fell. At that time, he said that they went in and one of them held her down and then moved some couches on her legs and then put like a pillow on her face and held down her arms and they was taking turns while one of them would search through stuff. He said they didn't get much like credit cards or something.

The Defendant also told Bailey that "the only reason he noticed [the victim] died is because she defecated on herself." Bailey testified that he had pending criminal charges, but he stated that he was testifying because he did not "believe it would be right if [the Defendant] was to get away with that." Bailey also stated that the Defendant got into several fights while he was in prison. He said that the Defendant was "calm and collected" when he recounted what he did to the victim. On cross-examination, Bailey denied any involvement with gangs, and he confirmed that he and the Defendant had been in a fight with another inmate. He stated that he got thrown into the "hole" for one of these altercations, but he did not blame the Defendant for this. Bailey said that he had received no promises in exchange for his testimony. On redirect examination, Bailey stated that he had not read or heard anything about the incident prior to what the Defendant told him. Curtis Carico, another inmate who was confined with the Defendant, stated that he did not wish to testify but that the Defendant had not threatened him in any way.

Justin Adams, the lead investigator on the victim's homicide, testified that he interviewed the Defendant at the Kingsport Police Department on August 20, 2015. He stated that the police department was not equipped to record interviews, so he taped the Defendant's interview on his iPad; however, when the screen "timed out" on his iPad, the recording was cut off. Investigator Adams was not aware of this issue until the conclusion of the interview. He said that the interview continued for a few minutes after the iPad stopped recording. Investigator Adams said that the Defendant told him, "I played my part." The Defendant also told Investigator Adams that his DNA would be found on a pillow at the crime scene. Investigator Adams said that the Defendant mentioned this before anything was mentioned about "the crime scene and manner of death or mechanism of death." The Defendant also said, "This is real life," and "Everything that happened, what you're asking me, everyone who you've done talked to. . . people had parts. I take full responsibility. I had a part. There's your conviction."

The State played the recorded portion of the Defendant's interview for the jury. During the interview, Investigator Adams told the Defendant that they were investigating the circumstances surrounding the victim's stolen credit cards, and the Defendant said that the victim was co-defendant Garland's aunt. The Defendant repeatedly said that he was not a snitch. He recounted his relationship with co-defendant Garland, and he continually asked the investigators to "ask your question." Investigator Adams asked the Defendant how he knew the victim, and he said he knew her through co-defendant Garland. Investigator Adams also asked the Defendant if he could "pick up the phone and call [the victim] today," to which the Defendant did not respond. Investigator Adams continued, "It's not possible is it," and the Defendant said, "This is real life." The Defendant said that he did not kill the victim, but he said that he was there and he "helped do the shit." The video timed out shortly after he made these statements. The Defendant did not say anything about his DNA being found on the pillow or playing his part in the strangulation on the recorded portion of the video.

On cross-examination, Investigator Adams stated that the Defendant's case was his first homicide case as the lead investigator. He said that he was "unsure of a lot of things" when he interviewed the Defendant, other than that he was in possession of the victim's credit cards. He explained that he asked the Defendant several times to explain what he meant by "playing his part," but the Defendant was reluctant to say anything. Investigator Adams stated that he learned that co-defendant Garland knew the victim and that the victim had accused co-defendant Garland of stealing from her several years prior to her death. Defense counsel questioned Investigator Adams about the JCPD's General Order which requires officers to make a written statement of a recorded interview, and he said he was unaware of this order. Investigator Adams said that he was unable to complete a written statement from the Defendant because the Defendant "asked for counsel and the interview had to be stopped." He believed that the Defendant knew that the interview was being

"memorialized" because he asked about the iPad, and Investigator Adams told him that he was being recorded. Investigator Adams said that the conversation "turned to DNA" at some point, but he was "one hundred percent certain" that he did not bring up anything about the "pillow or strangulation or DNA" because he was unsure how the victim was killed at that point. He agreed that co-defendant Garland could have told the Defendant about the pillow, but he did not ask him this. Defense counsel showed Investigator Adams a photograph of the Defendant and co-defendant Garland from Kroger video surveillance, and Investigator Adams agreed that the Defendant was "significantly" heavier than co-defendant Garland. Investigator Adams said that there was no physical evidence that the Defendant was at the crime scene on August 17, 2015. He was not aware that the Defendant and co-defendant Garland had been to the victim's house a few days prior to her death. On redirect examination, Investigator Adams stated that co-defendant Garland's DNA was also not found at the crime scene.

KPD Investigator Gerald Ray testified that he saw the Defendant and Investigator Adams at the Kingsport Police Department on August 19, 2015. At one point during the Defendant's interview, Investigator Ray stood next to the door of the interview room, and he heard the Defendant crying and telling Investigator Adams that "he played a part in the strangulation but his DNA would not be found on the victim's neck, but it would be, his DNA would be found on a pillow." After hearing this, he walked away and told another investigator what he had heard. On cross-examination, Investigator Ray said that the door to the interview room was closed, but he could hear what was being said through the door. He said that he spoke to Investigator Adams about the case a couple of times. He was not aware of the problems with the video. Following this testimony, the State rested.

The Defendant, who was twenty-five years old at the time of trial, testified that he had been living in Johnson City with his mother for approximately two weeks prior to his incarceration. He described his childhood as "somewhat" rough, and he came out as gay when he was a teenager. He met co-defendant Garland when they were both in a group home as children, and they developed a friendship and eventually a romantic relationship. The Defendant left the group home in 2011 when he graduated from high school, and he moved outside of Tennessee and did not return until 2015. In August 2015, while the Defendant was staying with his mom, he received a Facebook message at 2:00 a.m. from co-defendant Garland, who he had not talked to since leaving the group home. Co-defendant Garland asked the Defendant if he wanted to meet the next day, and they eventually met at a hotel room, where they smoked weed and had sex. The Defendant returned to his mother's house, and he met with co-defendant Garland again the next day. He stated that co-defendant Garland told him that "he needed to go to his aunt's house because she was going to give him some money and some pills." He explained that he did not know this woman, and co-defendant Garland did not tell him her name. He said that co-defendant Garland told him to "play a role in acting straight[,]" so the Defendant went

into the victim's apartment with co-defendant Garland and sat on the couch while the victim and co-defendant Garland talked in the kitchen until the victim kicked them out. Defense counsel asked the Defendant if he remembered what was said during these conversations, and the State objected on hearsay grounds and also said, "He's making this up as he goes," to which defense counsel objected and requested a mistrial.

The Defendant stated that he did not see co-defendant Garland for a day and a half after the incident with the victim. The Defendant next saw co-defendant Garland at a festival, after which they went to the Defendant's mother's apartment; however, she told co-defendant Garland that he could not stay there, so he left. The Defendant received a text message from co-defendant Garland, stating that his "aunt" would give him money for doing odd jobs around her house. He stated that he did not want to go to the victim's house because of what happened previously, but he did not have anything to do, so he went. The Defendant stated that, when they arrived at the victim's apartment, he refused to go inside and instead stayed outside and smoked a cigarette and listened to music. He believed that they arrived at the victim's apartment around midnight, and co-defendant Garland knocked on the door, went inside, and came back outside five to ten minutes later. The Defendant did not see the victim that night. He stated that co-defendant Garland came out of the victim's apartment with money and a gift card and was "basically rushing" the Defendant, and he "reluctantly" walked with co-defendant Garland to a gas station. The Defendant said that co-defendant Garland told him to use the victim's card and that she was letting them borrow it, so he used the card to buy cigarettes and a Gatorade at the gas station.

The Defendant did not deny being at any of the places where the victim's credit card and Wal-Mart gift card were used. The Defendant said that he and co-defendant Garland walked around for hours after leaving the victim's house, and they eventually ended up at the Defendant's mother's house, where he snuck co-defendant Garland in through the window. The Defendant stated that they went to Red Lobster the next morning, and co-defendant Garland used the Defendant's phone to call Hickman to ask for a ride. He said he had never met Hickman prior to that night, but he knew Hickman's fiancé from the group home. He said that Hickman dropped him and co-defendant Garland off at his grandmother's house so that he could gather his clothes to take to his uncle's house in Kingsport. The Defendant confirmed that he was in an intimate relationship with co-defendant Garland at that time. They next went to Hickman's apartment, where the Defendant contacted his uncle to see if he and co-defendant Garland could stay with him. They went to McDonald's with Hickman and her fiancé, and co-defendant Garland gave Hickman the victim's credit card to pay for his and the Defendant's food. The Defendant did not believe that co-defendant Garland's behavior was out of the ordinary at that time. He said that Hickman dropped him and co-defendant Garland off at Burger King, and they went to his uncle's house and then to "different places" including Kroger and McDonald's, where they used the victim's credit card, although the Defendant insisted that he did not

know the credit card was stolen at that time. The Defendant said that co-defendant Garland would not take the credit card to pay for their food at McDonald's, so the Defendant paid, and they sat in the corner, at which point the Defendant saw that the Greyhound website was "pulled up" on his phone and he saw one-way tickets to New York City with the Defendant and co-defendant's names. He said that co-defendant Garland had his phone while he was paying for their food.

The Defendant said, "Before all this happened, I think I should have put two and two together." He explained that co-defendant Garland had a text on his phone that said, "Did you kill-who did you kill last night?" He stated that co-defendant Garland took the battery out of his phone after receiving this message, and he never used his phone again but used the Defendant's phone instead. After the Defendant saw the Greyhound tickets on his phone and that the card was declined, he "confronted" co-defendant Garland, who told him that he choked the victim when he was inside her apartment and robbed her. He said that co-defendant Garland also told him that the Defendant's DNA would be found in the victim's apartment and that the Defendant would be "convicted in this murder with him" because he "killed the bitch." The Defendant explained that he did not call the police because he was scared, and he was convinced that his DNA would be found at the victim's apartment since he had been there a few days prior. The Defendant insisted that he "never laid a hand on the [victim]," "never killed [the victim]," and never went inside her apartment that night. The Defendant and co-defendant Garland continued to go to different places, and the Defendant said he considered leaving but he did not know if co-defendant Garland was telling the truth about killing the victim. The Defendant described what happened at Shoney's, and he admitted that he lied to the officer about co-defendant Garland's name because he was scared and trying to protect co-defendant Garland. After the Shoney's bill was paid, the Defendant met co-defendant Garland at the mall. The Defendant said that "nothing really happened" between this time and when he was taken into custody.

The Defendant stated that he admitted to Investigator Adams that he was there and had "a part," but he insisted that he told Investigator Adams that he did not kill the victim. He said that he was not in the victim's apartment "helping" co-defendant Garland, and he explained that he "felt like the part that [he] played is that [he] should have called the police" when co-defendant Garland told him what happened. He insisted that he did not know that co-defendant Garland was killing and robbing the victim. The Defendant also said that he "never mentioned anything about a pillow," but he did say "something about strangulation because [co-defendant Garland] told [him] that he choked [the victim]."

On cross-examination, the State questioned the Defendant about his prior felony record, which included a 2014 conviction for larceny of a vehicle and a 2013 conviction for possessing a stolen vehicle. The Defendant reiterated that he did not say anything about

a pillow to Investigator Adams, although he stated that he may have said something about DNA because he was "convinced by [co-defendant Garland] that [his] DNA would be inside that apartment." He agreed that the only place he sat in the victim's apartment was her couch. The Defendant admitted that he told Investigator Adams "something about a strangulation," but he denied saying that he "played a part in the strangulation." The Defendant said that he felt like he played a part because he was "being a lookout for somebody while [co-defendant Garland] was in there killing that woman." The Defendant said that he was crying during his interview because he was embarrassed and ashamed of himself for not doing anything, but he insisted that he did not know what was going on inside the apartment. He stated that he told Investigator Adams that he took "full responsibility" because he used the victim's credit card. The Defendant stressed that he was protecting co-defendant Garland, who convinced the Defendant that his DNA would be found in the victim's apartment and that he would be convicted for her murder.

The Defendant explained that he was "not a lookout for murder or robbery[,]" but he "was a lookout for something that [he] did not [know] that was going on inside that apartment." He stated that co-defendant Garland was carrying money, a Walmart gift card, and a "green debit card" when he came out of the victim's apartment, and he told the Defendant that his aunt let him borrow the cards and money. The Defendant said that he did not know the victim's name when he went to her apartment with co-defendant Garland, and he did not hear anything that they said to each other. The Defendant said that he waited outside the victim's apartment on his "own will" on the night of August 17, 2015 "because of what happened two nights prior to that." He explained that he did not find it odd that co-defendant Garland had the victim's debit card because he believed that the victim was the co-defendant's aunt. The Defendant explained that, after they left the victim's apartment and arrived at the gas station, co-defendant Garland handed him the victim's card and told him to buy cigarettes, but he did not explain why he wanted the Defendant to make these purchases. The Defendant said that he and co-defendant Garland arrived at his mother's house around 4:00 a.m., and he did not know what had happened with the victim at that time. The Defendant then walked through the places where he and co-defendant Garland went the next day, as he said on direct examination. The Defendant explained that he did not leave co-defendant Garland during that time because the co-defendant had nowhere to go, and the Defendant did not want to "kick him to the curb."

The Defendant explained that, after staying the night at his uncle's house, he and co-defendant Garland walked to Red Roof Inn to get a room, but the credit card was declined. The Defendant had trouble remembering the days and times that he and co-defendant Garland did certain things. The Defendant stated that, as he and co-defendant Garland were walking down the road after leaving his uncle's house, they stopped at Kroger, and they saw the Red Roof Inn and decided they wanted to stay there. The receipt from Kroger showed that this took place around 10:54 p.m. The Defendant agreed that the

victim's card history did not show an attempted transaction at the Red Roof Inn. The Defendant stated that he and co-defendant Garland walked around Kingsport doing nothing and then went to McDonald's after leaving the Red Roof Inn, where the Defendant said he learned of the murder for the first time. The Defendant stated that they walked around for hours after leaving McDonald's because co-defendant Garland did not have anywhere to go. They went to Walmart to buy cigarettes, but the Defendant could not remember who purchased them. The Defendant stated that they walked back to the Red Roof Inn, where the cab driver picked them up. He insisted that he "never touched [the victim's] card again after leaving McDonald's the previous night. He explained that they took a cab to the Fort Henry Mall and walked to Shoney's. The Defendant said that he never told the waitress at Shoney's that the credit card had money on it from his grandmother, and he stated that co-defendant Garland had the card at that time. He explained that he lied because he was afraid of co-defendant Garland, and he was trying to protect him. The Defendant said he did not want to believe what was happening until he sat in the interview room with Investigator Adams, which was why he said, "This is real life." The Defendant insisted that co-defendant Garland used his phone to attempt to purchase the tickets from Greyhound. He agreed that he and co-defendant Garland were "constantly" in each other's presence during this time period, although the Defendant stated that he "tried leaving [co-defendant Garland]." After the Defendant's testimony, the defense rested.

Following deliberations, the jury convicted the Defendant as charged, and he was subsequently sentenced to a term of life imprisonment plus five years. On August 19, 2019, the trial court conducted a hearing on the Defendant's motion for new trial, which was denied. The Defendant filed a timely notice of appeal, and his case is now properly before this court for our review.

## ANALYSIS

**I. Prosecutorial Misconduct.** First, the Defendant asserts that the trial court abused its discretion in denying his request for a mistrial following "flagrantly inappropriate prosecutorial remarks made to the jury during the [D]efendant's direct examination testimony." He asserts that his credibility was the "central and defining issue" in his case, and that, because the prosecutor could not "otherwise prove that the [Defendant] was not credible, [he] effectively asserted it himself during the proof phase." In response, the State contends that the trial court properly exercised its discretion in denying the Defendant's motion for a mistrial. The State acknowledges that the prosecutor's comment was improper but asserts that he "misspoke in the heat of the moment" and "promptly apologized and admitted that he should not have made the comment." The State also asserts that the evidence against the Defendant was strong and notes that the trial court issued a curative instruction following the prosecutor's comment. We agree that the

comment was improper; however, it was not so inflammatory or improper to negatively affect the verdict.

During the Defendant's direct examination, while he was explaining what happened when he and co-defendant Garland went to the victim's apartment for the first time, the following exchange occurred:

[DEFENDANT]:  I was told to act straight and [co-defendant Garland] told me while we were going to his aunt's house that I needed to play a role - well, he didn't say I need to play a role, but he, to me, he wanted me to play a role that I didn't know how to play.  So when we get there, I just didn't speak or anything.  I went inside the apartment with [co-defendant Garland] and I sat on the couch and they went back into the kitchen somewhere and they were talking and she basically – we're in there for about five (5) minutes and she kicked us out and we left.

[DEFENSE COUNSEL]: Do you remember anything that was said or any substance of those conversations?

[DEFENDANT]: She said...

[PROSECUTOR]: Your Honor, again, we're going to object to what she said.  *He's making this up as he goes.*

[DEFENSE COUNSEL]: Now, Judge, I object to that.

Following this exchange, defense counsel requested a mistrial, which the trial court subsequently denied, stating that it had admonished the prosecutor from making further such comments.  The trial court also issued the following curative instruction to the jury:

Before we broke for lunch, [the prosecutor] made a comment that "He's making this up," something like that.  I'm going to instruct you to disregard that statement that was made by [the prosecutor].  Sometimes in the heat of the moment, I'm not going to say battle, but in the heat of the moment, people blurt things out and that was an improper statement.  Because whether or not a witness, whether it's the [D]efendant, an expert witness or any other witness, whether or not they've made something up or what they're saying is the truth or somewhere in between, you get to decide that, not anybody else and you base that on your observations and your recollection and all of the

- 16 -

testimony in the case, not what anybody else says.  Okay?  Everyone understand that?  Anybody have any questions?  That's the zebra we talked about that's gone through the room.  You all may not forget it but you cannot consider it in making your determinations in this case.  Everyone understand?  All right.

Prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)).  In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment."  State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996).

Although not exhaustive, Tennessee courts have recognized five general areas of potential improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge.  State v. Thompson, No. E2018-01481-CCA-R3-CD, 2019 WL 5298733, at *9 (Tenn. Crim. App. Oct. 18, 2019), perm. app. denied (Mar. 25, 2020) (citing State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)).

This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

(1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The decision to grant or deny a mistrial rests within the sound discretion of the trial

court and will not be reversed absent an abuse of discretion. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009); State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Robinson, 146 S.W.3d at 494 (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" Saylor, 117 S.W.3d at 250 (quoting State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "'The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.'" State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (quoting State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The party seeking a mistrial has the burden of establishing the necessity for a mistrial. Reid, 164 S.W.3d at 342 (citing Williams, 929 S.W.2d at 388). In determining whether a trial court abused its discretion in granting or denying a mistrial, this court should consider the following factors: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citing State v. Lawrence Taylor, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *10 (Tenn. Crim. App. Feb. 14, 2003)).

As an initial matter, the prosecutor's comment that the Defendant was "making this up as he goes" was improper. However, upon review of the Judge factors, we do not consider this comment to be so inflammatory or improper that it negatively affected the verdict. The record shows the prosecutor's comment was made during the Defendant's testimony, while he was giving his version of events. The Defendant was testifying as to what co-defendant Garland and the victim said to him when they were inside the victim's apartment, and the prosecutor objected based on hearsay, followed by the comment in question, that the Defendant was "making this up as he goes." Upon objection to the prosecutor's comment, the prosecutor immediately apologized. The trial court issued a lengthy curative instruction to the jury to disregard the statement and advised the jury that credibility was to be determined solely by the jury. The trial court also instructed the jury that statements, remarks, and arguments of counsel are not evidence. More significantly, the record shows that the evidence of the Defendant's guilt in this case was overwhelming. Receipts and videos showing the Defendant using the victim's gift card shortly after her death were admitted into evidence. Although the Defendant denied going inside the victim's apartment on the night of the offense, he admitted to "his part" in the offense as well as provided details of the offense to his cellmate. Accordingly, while the comment was indeed improper, it does not require reversal in this case. The Defendant is not entitled to relief on this issue.

**II. Pre-recorded Testimony of Dr. Scheuerman.** The Defendant asserts that, while Dr. Scheuerman was testifying about images related to the victim's autopsy, "the

[S]tate displayed those images *in lieu* of any visual representation of the witness." He argues, "This had the presumably unintended effect of unduly *emphasizing* graphic evidence that was patently prejudicial to the [Defendant] and depriving him of due process of law." He notes that "this may be an issue of first impression for this [C]ourt" and likens the issue to "other cases dealing with complaints of evidence emphasis. . . involv[ing] video or audio evidence that a jury has requested revisiting after the close of proof." He acknowledges that this issue must be reviewed under an abuse of discretion standard.

The State contends that the trial court properly allowed the State to use Dr. Scheuerman's video deposition at trial. The State asserts that the evidence was relevant and that "[d]ecisions about the admissibility of evidence are [generally] under the sound discretion of the trial judge." The State notes that Rule 15 of the Tennessee Rules of Criminal Procedure controls the taking of depositions and asserts that "Dr. Scheuerman's deposition was taken prior to trial, without objection, and played at trial, without objection." The State asserts that, "if Dr. Scheuerman [was] testifying live, the lights in the courtroom would have been dimmed, and the jurors still would not have seen [his] face, but would have instead focused on the exhibits." The State also notes that Dr. Scheuerman was an expert witness presenting his findings based on his investigation, not an eyewitness. The State acknowledges that the "trial court found that case law allowed such a procedure so long as the [D]efendant and counsel had the opportunity to confront and cross-examine Dr. Scheuerman." It asserts that the trial court did not abuse its discretion in admitting this deposition, and, even so, any error in its admission was harmless.

Tennessee Rule of Criminal Procedure 15 governs the taking of depositions:

A party may move that a prospective witness be deposed in order to preserve testimony for trial. Any such motion may be filed at any time after the defendant's initial appearance before a magistrate and after the defendant has been afforded counsel. Such motion shall be filed in a court of record. The Court may:

> (A) grant the motion because of exceptional circumstances and in the interest of justice; and

> (B) order that the witness produce at the deposition any designated, non-privileged book, paper, document, record, recording, or other material.

- 19 -

Additionally, Tennessee Rule of Criminal Procedure 15(f) allows depositions to be used as substantive evidence if the witness is unavailable. Prior to trial, the State moved the trial court, pursuant to TRCP 15, to order the video deposition of Dr. Scheuerman because he was unavailable to testify at the Defendant's trial. According to the record, the Defendant did not object to this motion, and Dr. Scheuerman's deposition was taken on February 22, 2018, while the Defendant and trial counsel were present. While Dr. Scheuerman was identifying autopsy photographs taken of the victim, the State displayed these images on the screen, while Dr. Scheuerman described them. During this time, which lasted approximately one hour, the jury could only see the photographs and not Dr. Scheuerman's face. At this point during the trial, while the video was playing, defense counsel objected based on the fact that the jury could not see Dr. Scheuerman to judge his credibility while the images were being displayed on the screen, which the trial court overruled.

In denying relief at the Defendant's motion for new trial, the trial court determined as follows:

> With Dr. Scheuerman, the [f]orensic [p]athologist in the case, no illness on his part, but the Court can't recall, but it was some reason that he could not be here at that time. I'm not sure if it was a trip that he had planned and prepaid. . .
>
> His daughter's graduation from college I think is correct. So the Court allowed that, again, video-taped evidence or video-tape recording equipment was set up. The evidence was taken by way of direct examination, cross examination by [defense counsel]. That's an impressive argument, [defense counsel], about what was shown on the screen as you stated. The Court is amazed we even have video equipment available to do this but we were able to do that. But it was such that it was one camera, so as the witness testified about a picture, a picture was placed on the screen and that's what the jury saw while the witness testified. The State's argument, and the Court thinks it's a good one, is that when things are placed upon the wall here on the projector or the lights are turned down, that is where the jurors' attention is directed to begin with. So it is true that the jury could not see Dr. Scheuerman's face while he was talking about what was on the screen, but as soon as the next exhibit came up, the camera went back to Dr. Scheuerman for purposes of testimony and then back to another exhibit. The Court finds that the case law allows such a procedure. Case law allows video-recorded testimony so long as the defendant and counsel has the opportunity to confront and cross examine that particular witness. The Court ensured that [the Defendant], despite his objection, who did not want to be here for those, was ordered to be here. [Defense counsel] had the opportunity to do that and the jury had the opportunity to view this, and while they may not have seen

Dr. Scheuerman's face, when an exhibit would have been there, they had ample opportunity to view Dr. Scheuerman on the video as well as the exhibits. So the Court finds that those Grounds Three (3) and Four (4) are respectfully denied regarding the Motion for New Trial.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006).

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror." State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted). The Sixth Amendment to the United States Constitution gives an accused the right "to be confronted with the witnesses against him," and this right is given to the States through the Fourteenth Amendment. In addition, the Tennessee Constitution also gives an accused the right "to meet the witnesses face to face."

As we understand his claim, the Defendant seeks to require the State to show the face of a witness, Dr. Scheuerman, simultaneously with the viewing of photographs pertaining to their testimony. However, the Defendant candidly acknowledges that reliance on State v. Jenkins, 845 S.W.2d 787, 793 (Tenn. Crim. App. 1992) for the proposition that the trial court erred in allowing these images to be displayed in lieu of Dr. Scheuerman's face is misplaced. He has not provided any other authority in support of this issue, and we decline to control a party's case in the courtroom in the fashion the Defendant seeks. Accordingly, we conclude that the display of autopsy photographs in lieu of Dr. Scheuerman's face was not unfairly prejudicial to the Defendant, and his rights under the due process clause were not violated because he and trial counsel were present at Dr.

Scheuerman's deposition and allowed to cross-examine him. We agree with the trial court's reasoning that, even if Dr. Scheuerman was testifying in front of the jury, the lights in the courtroom would likely be dimmed and the jury's attention would be focused on the images instead of the witness's face. As such, we conclude that the trial court did not abuse its discretion in allowing the video deposition of Dr. Scheuerman to be entered into evidence, despite the jury's inability to see the witness's face for a large portion of the deposition. He is not entitled to relief on this issue.

**III.** **Sufficiency of the Evidence**. Next, the Defendant argues that the evidence is insufficient to support his convictions for first-degree felony murder and robbery. He asserts that his testimony rebuts the State's assertions that he "entered the victim's dwelling with [co-defendant Garland] on the evening of the murder and participated in the robbery." He states that his "'non-entry' cannot be disproven by the [S]tate by any physical evidence or eyewitness testimony" and that "the State's theory of the case rests on the presumption that not only did the [Defendant] enter her apartment, he engaged in numerous physical acts which would have left his DNA, hair, and fingerprints all over the apartment." He asserts, "[e]xcluding the statements of the [Defendant] to law enforcement and purportedly to inmate Derek Bailey, the State's entire case is based on circumstantial evidence requiring the trier of fact to make inferences of guilt based upon the [Defendant's] use of the victim's debit and gift cards after her death." He states that he acknowledged and explained this during his testimony, and he asserts that Dr. Scheuermman's testimony supports his explanation. The State responds that the evidence is sufficient to support the Defendant's convictions because there was evidence that the Defendant intended to rob the victim. The State contends, "[t]he jury could reasonably infer from the [D]efendant's actions before, during, and after the killing, that not only did he intend to rob the victim, but he benefitted from the proceeds of the robbery." The State asserts that, even if the Defendant did not enter the victim's apartment, he is guilty under a theory of criminal responsibility. We agree with the State that the evidence is sufficient to support the Defendant's convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that

- 22 -

evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant here, first-degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any ... robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2011). No culpable mental state is required for conviction of felony murder except the intent to commit the underlying felony. Id. § 39-13-202(b) (Supp. 2011). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401. A person is criminally responsible for an offense committed by the conduct of another, if: (2) "Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402.

Viewing the evidence in the light most favorable to the State, the Defendant and co-defendant Garland reconnected a few days before the victim's death and shared an intimate relationship. A few days prior to the victim's death, co-defendant Garland brought the Defendant to the victim's house because the victim was going to give co-defendant Garland "money and pills." The co-defendant told the Defendant to "act straight" when they were in the victim's apartment, and the Defendant waited on the victim's couch until she told him and co-defendant Garland to leave. They returned to the victim's apartment a few

days later after co-defendant Garland told the Defendant that the victim would give them money for doing "odd jobs" around her house.

Based on the proof, the men entered the victim's apartment in the late night hours of August 17, 2015, killed her, and ransacked her apartment, taking money, the victim's debit card, and a Wal-Mart gift card given to the victim by her sister. The forensic pathologist testified that the victim's cause of death was "suffocation, blunt force injuries, and possible manual strangulation." The victim was found the next morning on the floor of her living room with a blanket and pillow covering her face and her couch resting atop one of her legs. She also had bruising on her arms, legs, face, and neck, which her neighbor said were not present prior to that night. The victim's apartment was also in an unusual state of disarray. Over the next few days, the victim's debit card and Wal-Mart gift card were used several times, including purchases at Wal-Mart, McDonald's, Cabbie Cab, Shoney's, Greyhound, Kroger, Exxon, and KFC, some of which were declined after the victim's family cancelled her card. The State introduced receipts from several of these purchases, and video surveillance showed the Defendant and co-defendant Garland making purchases at McDonald's with the victim's card. The Defendant was arrested with the victim's cards on his person. Additionally, during the Defendant's interview, he told Investigator Adams, "I played my part[,]" "I take full responsibility[,]" and that his DNA would be found on the victim's pillow. An inmate housed with the Defendant also testified that the Defendant confessed to him that he and co-defendant Garland had entered the victim's apartment, held her down, and took turns holding a pillow on her face while the other searched the victim's apartment. The Defendant also told his cell-mate that "the only reason he noticed [the victim] died is because she defecated on herself." The jury heard the Defendant's version of events and, by its verdict, discredited him and weighed the evidence in favor of the State. See State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008); State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (holding that "[q]uestions involving the credibility of witnesses, the weight and value of the evidence, and all factual disputes raised by the evidence are entrusted to the trier of fact.") Accordingly, the evidence is sufficient to support the Defendant's convictions for felony murder and robbery. He is not entitled to relief on this issue.

**IV. Cumulative Error.** The Defendant argues, and the State disagrees, that he is entitled to relief under the cumulative error doctrine. The cumulative error doctrine provides, in short, as follows:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

- 24 -

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). Because we have determined that the trial court did not err on any of the Defendant's aforementioned issues, we need not consider the cumulative effect of the alleged errors. Hester, 324 S.W.3d at 77 ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

## CONCLUSION

Based on the preceding authority and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE